JOHN REDELL, APPELLEE, V. FRANK E. MOORES ET AL., AP-PELLANTS.

FILED DECEMBER 4, 1901.    No. 12,124.

Commissioner's opinion, Department No. 3.

1. Statute: UNCONSTITUTIONAL PORTION: INDUCEMENT TO ADOPTION. Where portions of a statute are held unconstitutional, if the remainder is not so connected with such portion as to be incapable of separation, and the remainder is a complete act, and not dependent upon the part held invalid, the latter alone will be disregarded and the remainder upheld, except in cases where it is apparent that the rejected part was an inducement to the adoption of the remainder.

2. Construction of Statute: JUDICIAL NOTICE: COMMON KNOWLEDGE. In the construction of a statute, courts will take judicial notice of events which are generally known, and matters of common knowledge within the limits of their jurisdiction.

3. Municipal Corporation: POWER TO CREATE: POWER TO IMPOSE LIMITATIONS. The power to create a municipal corporation is vested in the legislature, and implies the power to create it with such limitations as that body may see fit to impose, and to impose such limitations at any stage of its existence.

4. Fire and Police Commission: LEGISLATURE: GOVERNOR. The legislature may by statute confer upon the governor the power to appoint members of the board of fire and police commissioners of cities of the metropolitan class. *State v. Moores*, 55 Nebr., 480, overruled.

APPEAL from the district court for Douglas county. Heard below before ESTELLE, J. *Reversed.* NORVAL, C. J., dissenting.

*W. J. Connell,* for appellants.

*Frank T. Ransom, William F. Gurley* and *Wright & Stout, contra.*

ALBERT, C.

This action was brought in the district court of Douglas county, by John Redell, chief of the fire department of the city of Omaha, against Frank E. Moores and others, constituting the board of fire and police commissioners of that city, to restrain the defendants from hearing and determining certain charges filed with said board against the plaintiff, and from removing or suspending him from his said office. The trial court found for the plaintiff, and entered a decree accordingly. The defendants bring the case here on appeal.

The sole question presented by the appeal is, whether the board of fire and police commissioners have authority to hear and determine the charges filed against the plaintiff, and to remove or suspend him from the office of chief of the fire department in case its findings on said charges should be adverse to him. The determination of that question involves the constitutionality of section 169, chapter 12a, of the Compiled Statutes. That section is a part of an act passed by the legislature in 1897, entitled an act incorporating metropolitan cities, and defining, prescribing and regulating their duties, powers and government, and to repeal a similar act passed in 1887. The act is too long to set out at length, so it must suffice to say, taken as a whole, it provides a complete scheme for the government of cities of the metropolitan class. The sections most pertinent to the present inquiry are as follows:

"Sec. 166. In each city of the metropolitan class, there shall be a board of fire and police commissioners, to consist of the mayor, who shall be ex-officio chairman of the board,

and four electors of the city who shall be appointed by the governor.

"Sec. 167. Immediately on the taking effect of this act, the governor shall appoint for each city governed by this act four commissioners, not more than two of whom shall be of the same political faith or party allegiance, one of whom shall be designated to serve until the first Monday of April, 1898, and one to serve until the first Monday of April, 1899, and one to serve until the first Monday of April, 1900, and one to serve until the first Monday of April, 1901, and on the last Tuesday in March in 1898, and on the same day in each year thereafter, the governor shall appoint one commissioner in each city governed by this act, to take the place of the commissioner whose term of office expires on the first Monday in April following such appointment, and those so appointed to succeed others shall serve for the term of four years, following the first Monday in April after their appointment, except where appointments are made to fill vacancies, in which cases those appointed shall serve the remainder of term of the persons whose vacancies they are appointed to fill. Whenever a vacancy shall occur in any board of fire and police commissioners either by death, resignation, removal from the city or any other cause, the governor shall appoint a commissioner to fill such vacancy.

"Sec. 168. No person shall be appointed a police commissioner who is engaged in the sale of malt, spirituous or vinous liquors, or who is engaged in the business of dealing in tobacco or articles manufactured therefrom, or who is agent for any fire insurance company or companies or interested therein, or in the business of soliciting fire insurance, or who shall have been engaged in any such callings or business within one year previous to the date of appointment. No person shall be qualified to hold the office of police commissioner, while he holds any county, city or school district office. The governor may remove any of said commissioners for misconduct in office, or should they, or any of them, become disqualified to act as such commis-

sioner. Any citizen of the city may file with the governor written charges against any commissioner he may deem guilty of misconduct in office, and the governor shall, within a reasonable time, investigate the same upon testimony to be produced before him and shall make such findings as to the truth or falsity of such charges as in his judgment such testimony warrants, and in case such charges are adjudged by him to be sustained by the evidence, he shall at once remove the commissioner so found guilty and appoint another qualified to fill the vacancy thus caused. The governor, when sitting to investigate charges preferred against a commissioner, shall have full power and authority to compel the attendance of witnesses and the production of books and papers, and he may hold such meeting at the most convenient place in the state for the purpose of such investigation. In making all appointments, either to fill vacancies or otherwise, he shall so appoint that not more than two members of the fire and police commissioners shall be of the same political faith or party allegiance.

"Sec. 169. All powers and duties connected with and incident to the appointment, removal, government and discipline of the officers and members of the fire and police departments of the city, under such rules and regulations as may be adopted by the board of fire and police commissioners, shall be vested in and exercised by said board. A majority of said board shall constitute a quorum for the transaction of business. Before entering upon their duties each of said officers shall take and subscribe an oath, to be filed with the city clerk, faithfully, impartially, honestly and to the best of his ability, to discharge his duties as a member of said board, and that in making appointments or considering promotion, or removals, he will not be guided or actuated by political motives or influences, but will consider only the interest of the city, and the success and effectiveness of said department. The board of fire and police commissioners shall have power, and it shall be the duty of said board, to appoint a chief of the fire de-

partment, and such other officers of the fire department, as may be deemed necessary for its proper direction, management and regulation, all of whom shall be electors of such city, and under such rules and regulations as may be adopted by said board. Said board may remove such officers or any of them, whenever said board shall consider and declare such removal necessary for the proper management or discipline or for the more effective working or service of said department. It shall be the duty of policemen to make a daily report to the chief of police of the time of lighting and extinguishing of all public lights and lamps upon their beats, and also any lamp that may be broken or out of repair. They shall also report to the same officer any defect in any sidewalk, street, alley or other public highway, or the existence of ice or dangerous obstructions on the walks or streets, or break in any sewer, or disagreeable odors emanating from inlets to sewers, or any violations of the health laws or ordinances of the city. Suitable blanks for making such reports shall be furnished to the chief of police by the chief electrician and health commissioner. Such reports shall be by the chief of police transmitted to the city electrician or health commissioner as shall be proper, and in case of violations of law or ordinance the policeman making report shall report the facts to the city prosecutor. The board of fire and police commissioners shall employ such firemen and assistants, as may be proper and necessary for the effective service of this department, to the extent and limit that the funds provided by the mayor and council for that purpose will allow. The board of fire and police commissioners shall have the power, and it shall be the duty of said board, to appoint a chief of police, and such other officers and policemen, all of whom shall be electors of such city, to the extent that funds may be provided by the mayor and council, to pay their salaries, and as may be necessary for the proper protection and efficient policing of the city, and as may be necessary to protect citizens and property, and maintain peace and good order. The board may appoint

such number of police matrons, not to exceed two, whose duty shall be defined by the police board. The chief of police and all other police officers, policemen and police matron, shall be subject to removal by the board of fire and police commissioners, under such rules and regulations as may be adopted by said board, whenever said board shall consider and declare such removal necessary for the proper management or discipline or for the more effective working or service of the police department. No member or officer of the police or fire department shall be discharged for political reasons, nor shall a person be employed or taken into either of said departments for political reasons. Before a member of the police or fire department can be discharged, charges must be filed against him before the board of fire and police commissioners and a hearing had thereon, and an opportunity given such member to defend against such charges, but this provision shall not be construed to prevent peremptory suspension of such member by his superiors in case of misconduct or neglect of duty or disobedience of orders. Whenever any such suspension is made charges shall be at once filed before the board of fire and police commissioners by the person ordering such suspension, and a trial had thereon at the second meeting of the board thereafter. It shall be the duty of said board of fire and police commissioners to adopt such rules and regulations for the guidance of the officers and men of said department, for the appointment, promotion, removal, trial or discipline of said officers, men and matron, as said board shall consider proper and necessary. The board shall have the power to enforce the attendance of witnesses, and the production of books and papers, and to administer oaths to them in the same manner and with like effect and under the same penalties, as in the case of magistrates exercising civil and criminal jurisdiction under the statutes of the state of Nebraska. The board shall have such other powers and perform such other duties as may be authorized or defined by ordinance."

It is clear that the provisions cited are ample, if upheld,

to confer upon the board of fire and police commissioners the power to do the acts sought to be restrained by this action. But in the case of *State v. Moores*, 55 Nebr., 480, this court held (SULLIVAN, J., dissenting) that, so far as the act in question assumes to confer authority upon the governor to appoint members of the board of fire and police commissioners, it is unconstitutional, on the ground that it is an unlawful attempt to deprive the people of cities of the metropolitan class of the right of local self-government.

Assuming that the majority opinion in that case is the settled law of the state, the question arises whether section 169, just quoted, must fall with those provisions placing the appointing power in the hands of the governor, which, we have seen, have been held unconstitutional. That a part of an act, or even a part of the same section of an act, may, under some circumstances, be held unconstitutional, without invalidating the remainder, is elementary. This court has said that "Where a statute contains provisions which are invalid or unconstitutional, if the valid and invalid portions are not so connected as to be incapable of separation, and the valid part is a complete act and not dependent upon the part that is void, the latter alone will be disregarded and the remainder upheld, * * * except in cases where it is apparent that the rejected part was an inducement to the adoption of the remainder." *State v. Moore*, 48 Nebr., 870; *Scott v. Flowers*, 61 Nebr., 620; *State v. Lancaster County*, 6 Nebr., 474; *State v. Hardy*, 7 Nebr., 377; *State v. Lancaster County*, 17 Nebr., 85; *State v. Hurds*, 19 Nebr., 316; *Trumble v. Trumble*, 37 Nebr., 340; *Low v. Rees Printing Co.*, 41 Nebr., 127; *State v. Stuht*, 52 Nebr., 209. In view of the doctrine announced in the cases just cited, we are not called upon to determine the effect of the decision in the case of *State v. Moores, supra,* on the entire act, because it follows irresistibly that the section held invalid drags down with it only such other parts as are inseparably connected with, dependent upon, or incomplete with-

out it, or for the passage of which it served as an induce-
ment. One question, then, that meets us at this point, is
whether that portion of the act held invalid, namely, that
portion conferring the appointing power on the governor,
served as an inducement to the legislature for the passage
of the other portions of the sections hereinbefore set forth.
Counsel for the defendant insists that this question is to
be determined solely by an inspection of the act itself. In
this view we are disposed to concur, with this qualifica-
tion, however: that the persons whose duty it may be to
inspect the act with a view to the determination of that
question are not required to divest themselves of all knowl-
edge save that to be gleaned from the act alone. For,
were it possible for them thus to divest themselves, the
act would be unintelligible,—a jumble of words without
meaning. So, when we say that the question is to be de-
termined by an inspection of the act itself, we imply that
those under whose inspection it is brought will scan it in
the light of that knowledge which they possess in common
with other men. There is no presumption that courts are
ignorant of all matters that transpire outside the court
room. On the contrary, there are many matters outside
the science of the law of which they are required to take
judicial notice. Bishop, in his work on Statutory Crimes
[3d ed.], section 77, says, "They [courts] do not close their
eyes to what they know of the history of the country and of
the law, of the condition of the law at the particular time,
of the public necessities felt, and other like things." The
supreme court of Michigan, in *Sibley v. Smith,* 2 Mich.,
487, say, "Courts are authorized to collect the intention
of the legislature from the occasion and necessity of the
law,—from the mischief felt, and the objects and remedy
in view." The supreme court of the United States, speak-
ing through Davis, J., in the case of *United States v.
Union P. R. Co.,* 91 U. S., 72, says, "Courts, in construing
a statute, may with propriety recur to the history of the
times when it was passed, and this is frequently necessary,
in order to ascertain the reason, as well as the meaning

of particular provisions in it." In *Stout v. Board of Commissioners*, 107 Ind., 343, 8 N. E. Rep., 222, it is held, that the history of a country, its topography and general conditions, are elements which enter into the construction of laws made to govern it, and are matters of which the courts will take judicial notice. It has been held that the general state of opinion, public, judicial and legislative, at the time of an enactment of a measure may be considered by the courts in construing it. *Keyport Steamboat Co. v. Farmers' Transportation Co.*, 18 N. J. Eq., 13; *Delaplane v. Crenshaw*, 15 Gratt. [Va.], 457. In *State v. Boyd*, 34 Nebr., 435, it was held that courts will take notice, without proof, of events which are generally known within the limits of their jurisdiction. The foregoing, we think, makes it clear, were it ever doubtful, that in the determination of the question before us we are neither required nor permitted to affect ignorance of those things which are matters of common knowledge. The attempt to confer upon the governor the power to appoint members of the board of fire and police commissioners, and the reasons urged in support of such measure, are a part of the legislative history of the state. No other feature of the act under consideration, nor of those it was intended to supersede, attracted so much attention or invited so much discussion as that which placed the power of appointment in the hands of the governor, removing, as it was claimed at the time, the board of fire and police commissioners from the influence of local politics. It is a matter of common knowledge that this feature of the act, so far as the board of fire and police commissioners is concerned, was the chief inducement to its passage. Without that feature, its promoters would have regarded it much as they would have regarded the play of Hamlet with Hamlet left out.

But, aside from those extrinsic facts, in our opinion it is clear that portion which has been held to be invalid served as an inducement for the passage of the other parts relating to the board of fire and police commissioners.

The sections quoted provide a complete scheme for the organization of such board. They provide for the appointment of the members, prescribe their qualifications and define the powers and duties of the board. The central thought in the whole scheme is to make the board answerable to the governor, and to remove it from local influences. Strike out those portions relating to the powers and duties of the governor in the premises, and the scheme is incomplete. With these parts stricken out, it is true, there remains a provision for the appointment of such board, and provisions relating to their qualification, and defining their powers and duties; but by whom would they be appointed? Counsel for the defendants claim that, with those provisions stricken out, the power of appointment would reside in the mayor, under the general power vested in him by virtue of the provisions of section 72 of the act, which is as follows: "The mayor shall have power by and with the consent of a majority of the entire council to appoint all officers that may be deemed necessary for the good government of the city, other than those otherwise provided for in this act." Session Laws, 1897, ch. 10. Nothing, to our minds, shows more clearly that the invalid portion was an inducement to the passage of the other parts of the sections quoted, than the fact that, with such invalid portion omitted, resort must be had to section 72 to carry out the remainder. Section 72 shows clearly an intention on the part of the legislature to limit the appointing power of the mayor to such officers whose appointment has not been otherwise provided for by the act. Members of the board of fire and police commissioners are otherwise provided for by the act, because it provides for their appointment by the governor. To hold, under the circumstances, that it would be carrying out the intention of the legislature to permit the mayor to appoint the members of such board, would do violence to common sense, which, after all, is the final arbiter in matters of doubtful construction. In our opinion, whether the act be viewed in the light of the history

of its enactment, or, apart from such consideration, it shows clearly that that portion conferring the power of appointment on the governor was an inducement to the passage of the other provisions, relative to the fire and police commissioners, and that the former must stand or fall with the latter; and the decree of the district court is right, and should stand, unless the views hereinafter expressed are adopted.

We are fully alive to the confusion in the municipal affairs of the city of Omaha that must result from the adoption of the foregoing views by this court. But for those results we are not responsible. The responsibility of this court ends when it has applied the law as it finds it. It has no constitutional warrant to add to a legislative enactment to meet the exigencies of a particular case. But, in view of those results, we have been led to re-examine the majority opinion in *State v. Moores, supra,* which up to this point we have assumed to be the final expression of this court on the questions therein involved. After a careful examination of that opinion, and with a due appreciation of the learning and ability of the members of the court who concur therein, we beg to say it does not commend itself to our judgment. It holds that the provisions of the statute placing the power to appoint members of the board of fire and police commissioners in the hands of the governor are invalid, not because it is in conflict with any express provision of the state or federal constitution, but because it is repugnant to the inherent right of local self-government, which, it is claimed, was retained by the people at the time of the adoption of the organic law. So far as the individual members of society are concerned, in the nature of things, there can be no such things as an inherent right of local self-government. The right of local self-government is purely a political right, and all political rights, of necessity, have their foundation in human government. For an individual to predicate an inherent right — a right inborn and inbred — on a foundation of human origin involves a contradiction of

terms. So far as a city is concerned, considered in the character of an artificial being, it is a creature of the legislature. It can have no rights save those bestowed upon it by its creator. As it might have been created lacking some right bestowed upon it,. it is in no position to complain should the power that bestowed such right see fit to take it away. In other words, the power to create implies the power to impose upon the creature such limitations as the creator may will, and to modify or even destroy what has been created. The power to create a municipal corporation, which is vested in the legislature, implies the power to create it with such limitations as the legislature may see fit to impose, and to impose such limitations at any stage of its existence. That such power may not always be exercised most wisely is among the possibilities, but that does not warrant this court in wresting it from the hands to which the people, by the fundamental law of the state, have confided it. We shall not attempt to review the authorities bearing on this question. The majority opinion leaves nothing to be said on one side, while the minority opinion is equally exhaustive on the other. To those opinions we must refer the court. The majority opinion, to our minds, introduces a new principle in our system of jurisprudence, and one pregnant with mischievous consequences. We have been taught to regard the state and federal constitutions as the sole tests by which the validity of the acts of the legislature are to be determined. If the majority opinion in that case is to stand as the settled law of the state, then in addition to such tests there is another,—an elusive something, elastic and uncertain as an unwritten constitution, which may be invoked to defeat the legislative will. We can not believe that such principle should receive the final sanction of this court.

The case of *City of Newport v. Horton*, 50 L. R. A. [R. I.], 330, adds strength to our convictions on this point. In that case, after a critical review of the authorities,. the court arrives at the conclusion that the case of *State v. Moores, supra*, is unsupported by a single authority.

For these reasons, together with those so well expressed in the minority opinion, we believe the majority opinion should be overruled. It would follow, then, that the board of fire and police commissioners having been created by valid statutory enactment, and thereby clothed with full authority to do the acts sought to be restrained herein, and the defendants being at least *de facto* members thereof, the decree of the district court should be reversed and the cause remanded for further proceedings according to law, and we so recommend.

DUFFIE and AMES, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the decree of the district court is reversed and the cause remanded for further proceedings according to law.

REVERSED AND REMANDED.

SULLIVAN, J., concurring.

I dissented from the judgment in *State v. Moores,* 55 Nebr., 480; and in *State v. Kennedy,* 60 Nebr., 300, which was controlled by the doctrine of *res adjudicata,* I said with respect to the decision in the *Moores Case:* "The *Moores Case* lays down the doctrine that whatever the court may conceive to be the spirit of the constitution is to be regarded as part of the paramount law. While the decision, by recognizing and enforcing the asserted right of local self-government, is conceded to rest upon a sound political principle, it was rendered by a divided bench, and, as a judicial pronouncement, has been much criticised. If it is to be acquiesced in and accepted as a rule of construction, the constitution of the state is to be fully known only by studying the theory of the judges who are chosen to expound it; it will expand or contract with every fluctuation of the popular will which produces a change in the personnel of the court, and the limitations upon legislative power will be as unknown and unknowable as were the rules of equity in the days when the chan-

cellor's conscience was the law of the land. It is the opinion of the writer that the decision is thoroughly vicious; that it strikes a lethal blow at a co-ordinate branch of the government and ought to be repudiated and condemned." Still entertaining these views,—still believing that all the governmental powers of municipal corporations come from the legislature and are to be found only in living statutes,—I could not, of course, do otherwise than give my approval to the conclusion reached by the department.

NORVAL, C. J., dissenting.

I dissent for the reasons stated in the majority opinion in *State v. Moores,* 55 Nebr., 480. Furthermore, the correctness of the decision in that case is not questioned or raised in the brief of counsel for either party, in this litigation, and this court has repeatedly ruled that questions not raised in the brief are waived. *Peaks v. Lord,* 42 Nebr., 15; *Madsen v. State,* 44 Nebr., 631; *Erck v. Omaha Nat. Bank,* 43 Nebr., 613; *Johnson v. Gulick,* 46 Nebr., 817; *Wood Mowing & Reaping Machine Co. v. Gerhold,* 47 Nebr., 397. The opinion of the majority establishes a bad precedent in deciding a question not raised or argued by counsel.

NOTE.—*Legislative Control Over Municipal Corporations.*—A municipal corporation is, so far as its purely municipal relations are concerned, simply an agency of the state for conducting the affairs of government, and as such is subject to the control of the legislature. *Williams v. Eggleston,* 170 U. S., 304.

Cities are auxiliaries of the state in the business of municipal rule, but they can not have the least pretension to sustain their privileges or their existence upon anything like a contract between themselves and the legislature. *Mt. Pleasant v. Beckwith,* 100 U. S., 514.

A municipal corporation is a public institution, created for public purposes, and is a political subdivision or department of the state, governed, regulated and constituted by public law. The original power to control as well as to create them, is in the legislature. *Payne v. Treadwell,* 16 Cal., 220.

Under the township system of New England, a much stronger argument can be advanced for local self-government than in a new state, like Nebraska, admitted since the adoption of the federal

Redell v. Moores.

constitution. For example, Rhode Island, when it became a chartered colony, 1647, under the charter of March 14, 1643-4, was formed by the union of the four independent settlements of Providence, Newport, Portsmouth and Warwick. These settlements, at the time of the union under the charter, reserved the right to manage their own local affairs. When Rhode Island ratified the Federal Constitution, May 29, 1790, she did not follow the example of the other states by adopting a state constitution; but operated under the charter of 1663 until 1843, a period of 180 years. When new towns were incorporated, it was with the express statement that each new town had all the powers of the old towns. So local municipal government became a vested right. Encyclopædia Brittanica, vol. XX., p. 539; Harvard Law Review, February, 1900, 447. Note by Amasa M. Eaton, to *City of Newport v. Horton*, 50 L. R. A., 330. See, also, authorities cited in briefs and opinions (majority and minority), *State v. Moores*, 55 Nebr., 480.

The power of the legislature over municipal corporations, in the absence of constitutional restrictions, is unlimited, except so far as they are invested with rights incident to a private corporation. *David v. Portland Water Committee*, 14 Ore., 98.

A city is merely a revocable agency instituted by the state for the purpose of carrying out in detail the objects of government. *Coyle v. McIntire*, 7 Houston [Del.], 44.

The establishment of a board of police commissioners is not unconstitutional on the ground of interference with the right of the city to local self-government, so far as the appointment of a chief of police by said commissioners is concerned, since a police officer does not perform a purely municipal, but a state duty. *City of Newport v. Horton*, 50 L. R. A. [R. I.], 330.

The right of a town to regulate its own finances and affairs superior to all legislative control, is not among the rights and privileges "derived from our ancestors," to "define, secure, and perpetuate" which existed when the constitution of Connecticut was adopted, and to which its preamble refers. *State v. Williams*, 68 Conn., 131. See, also, *People v. Draper*, 15 N. Y., 532.

*People v. Hurlbut*, 24 Mich., 44, is a construction of an express provision of the state constitution.

The separate opinion of Judge Cooley in the case last cited, seems not to agree with the doctrine laid down in his work, Constitutional Limitations. Compare 24 Mich., *93-*113, and Cooley, Constitutional Limitations [6th ed.], 227.

The reasoning adopted by courts and text-writers, who uphold the doctrine of municipal self-government, would seem to have been derived from Rousseau's *Contra Social* or Lewis Cass's theory of popular sovereignty. See Maine, Ancient Law, pp. 89, 90.—REPORTER.